☐ ORIGINAL

Approved: ⟋⟍⟋⟍⟋⟍ (signature)

ROBERT ALLEN
JENNIFER E. BURNS
Assistant United States Attorneys

**15 MAG 0008**

Before:    THE HONORABLE JAMES L. COTT
           United States Magistrate Judge
           Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOC # ___/___

- - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | : **SEALED** |
| | : **COMPLAINT** |
| - v. - | : |
| | : Violation of 18 U.S.C. |
| ASHRAF ASHOUR, | : § 1349 |
| JAMES KAUFMAN, | : |
| JIMMY JOSEPH, | : COUNTY OF OFFENSE: |
| BRISLEY DESIRE, | : NEW YORK |
|   a/k/a "Bruce," | : |
| PHILIP BRUNO, | : |
|   a/k/a "Paul," | : |
|   a/k/a "Bull," and | : |
| MARK NELSON, | : |
| | : |
|      Defendants. | : |

- - - - - - - - - - - - - - - - - - X

(Seal: U.S. DISTRICT COURT FILED JAN 05 2015 D.S. S.D. OF N.Y.)

SOUTHERN DISTRICT OF NEW YORK, ss.:

MARTHA M. BERDOTE, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

**COUNT ONE**

1.    From in or about July 2012, up to and including in or about December 2014, in the Southern District of New York and elsewhere, ASHRAF ASHOUR, JAMES KAUFMAN, JIMMY JOSEPH, BRISLEY DESIRE, a/k/a "Bruce," PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," and MARK NELSON, the defendants, and others known and unknown, willfully

1

and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 18, United States Code, Section 1347.

2.    It was a part and an object of the conspiracy that ASHRAF ASHOUR, JAMES KAUFMAN, JIMMY JOSEPH, BRISLEY  DESIRE, a/k/a "Bruce," PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," and MARK NELSON, the defendants, and others known and unknown, willfully and knowingly would and did execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and for the foregoing charge, are, in part, as follows:

3.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been personally involved in the investigation of this matter.  This affidavit is based upon my own observations, my conversations with other law enforcement agents and others, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Introduction

4.    In or about July 2012, a cooperating witness (the "CW")[1] informed the FBI that the CW had been approached by ASHRAF

---

[1]    The CW has pleaded guilty to insurance fraud and bank fraud offenses and is cooperating with the Government in the hope of receiving a benefit at sentencing.  Information that the CW has provided has proven reliable and has been corroborated by, among other things, consensually-recorded conversations, surveillance, police accident reports, insurance records, telephone records, and the investigation described below.

ASHOUR, the defendant, about participating in an insurance fraud scheme through a no-fault insurance clinic.  The CW, who had participated in an earlier insurance fraud scheme with ASHOUR, informed the FBI that ASHOUR was operating a clinic called Basmala Medical, P.C. ("Basmala Medical") in Brooklyn, New York.  The clinic submitted fraudulent claims to insurance companies for unnecessary medical treatment performed on co-conspirators who falsely claimed to have suffered injuries in automobile accidents.

5.    Based on instructions from the FBI, the CW agreed to enter into a partnership with ASHRAF ASHOUR, the defendant, who also recruited two co-conspirators not named as defendants herein ("CC-1" and "CC-2") into the Basmala Medical partnership and the insurance fraud scheme.  The CW provided funds, furnished by law enforcement, that were used by co-conspirators to, among other things, pay individuals who had been involved in automobile accidents to receive medical treatments they did not need.  The CW further helped ASHOUR, CC-1 and CC-2 operate Basmala Medical from in or about September 2012 until in or about January 2013.

6.    Based on my training and experience, I know that under New York State Law, every vehicle registered in New York State is required to have no-fault automobile insurance, which enables the driver and passengers of a vehicle registered and insured in New York State to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault.  This so-called "No-Fault Law" requires payments for medical treatments to be made promptly, thereby obviating the need to file personal injury lawsuits in order to be reimbursed for medical treatment.  Under the No-Fault Law, vehicle occupants can assign their right to reimbursement from an insurance company to others, including medical clinics that provided medical services to treat their injuries. When such an assignment is made, the medical clinics, or their agents, may bill the insurance company directly for services rendered and receive payment directly from the insurance company.

7.    Based on my experience, training and investigation of this matter, I believe Basmala Medical exploited the No-Fault system by paying "runners" to locate patients willing to make false injury claims, and then billing insurance companies for unnecessary medical care provided to those patients.  The CW paid "runners" for recruiting patients who would make false injury claims.  The runners were paid for each viable referral, and the amount of the payment depended upon the quality of the police accident report documenting the automobile accident and the likelihood that the particular automobile insurance company would pay for the medical treatment

provided.   The runners in turn coached the patients on the injury complaints that they should make and paid the patients to appear for unnecessary medical treatments.

8.   As described in greater detail below, the roles of defendants in the insurance fraud scheme were as follows:

a.   ASHRAF ASHOUR, the defendant, was a partner in Basmala Medical and a physical therapist who billed for unnecessary physical therapy treatments;

b.   CC-1 was a partner in Basmala Medical who was responsible for the day-to-day operation of the clinic;

c.   CC-2 was a partner in Basmala Medical and a paralegal employed by a law firm that represented car accident victims.   CC-2 brought accident victims to Basmala Medical who made false injury claims and assisted in the operation of the clinic;

d.   JAMES KAUFMAN, the defendant, was a chiropractor who performed unnecessary chiropractic treatments at Basmala Medical and who wrote prescriptions for medical equipment that was not needed;

e.   JIMMY JOSEPH, the defendant, was a runner who referred patients to the clinic who made false injury claims;

f.   BRISLEY DESIRE, a/k/a "Bruce," the defendant, was a runner who referred patients to the clinic who made false injury claims;

g.   PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," the defendant, was a runner who referred patients to the clinic who made false injury claims.

h.   MARK NELSON, the defendant, was a runner who referred at least one patient to the clinic who made false injury claims.

9.   Based on information received from the CW, my review of recordings made by the CW as well as transcripts of those recordings, and my review of records received from insurance companies, I believe the Basmala Medical insurance fraud scheme involved at least fifty patients, multiple false claims submitted to insurance companies for each of those fifty patients, and an intended loss of at least $2,600,000.

4

**ASHRAF ASHOUR, CC-1 and CC-2**

10.  On or about July 17, 2012, the CW met with ASHRAF ASHOUR, the defendant, in Brooklyn, New York.  Prior to this meeting the CW was outfitted with a recording device.  Based on my conversations with the CW and review of a recording from this meeting,[2] I learned that during the meeting, ASHOUR explained the insurance fraud scheme to the CW, including that they would pay "cash" to "runners" for bringing patients to the clinic who had documents establishing that they had been involved in automobile accidents.

11.  On or about August 26, 2012, the CW met with ASHRAF ASHOUR, the defendant, CC-1 and others in a Burger King restaurant in Brooklyn, New York.  Based on my conversations with the CW and review of a recording of this meeting, I learned that the following, in substance and in part, took place during the meeting:

a.  CC-1 began the meeting by collecting cellular telephones from all of the participants.  I believe, based on my training and experience, that CC-1 was concerned that the meeting would be recorded or otherwise monitored by law enforcement.

b.  CC-1 presented CC-1 as an "expert" in "no-fault" because CC-1 had prior experience as a clinic manager.

---

[2]  Unless otherwise noted, my summary descriptions of meetings and statements made during those meetings are based on both debriefings of the CW and my review of recordings made by the CW. Where I refer to quotations, those quotations are based on preliminary draft summaries and/or translations of recorded conversations, which took place in both English and Russian.  Those summaries and translations are subject to modification.  All of the recordings were prepared by the CW with recordings devices provided by the FBI.

        c.    CC-1 asked a runner ("Runner-1") how many patients Runner-1 could guarantee.[3]  Runner-1 responded that Runner-1 could bring in five or more patients per week.

        12.    On or about August 30, 2012, the CW met with ASHRAF ASHOUR, the defendant, in Brooklyn, New York.  Based on my debriefing of the CW and review of the recording, I have learned that during the meeting, the following conversation, in substance and in part, took place:

| | |
|---|---|
| CW: | Okay, now.  Let me ask you.  In order not to be suspicious, in order not to create any additional attention that we don't need.  Right?  What can be, what, what we need to, to uh, avoid.  What, what, which test we gonna run for everybody and which test we're gonna run only on certain cases?  How shall we do this? |
| ASHOUR: | Alright.  This one is not for everyone. |
| CW | Range in motion is not for everyone. |
| ASHOUR: | No.  [U/I] everyone. |
| CW | For everyone.  Okay. [U/I] everyone.  It's not about, right, that's not gonna be suspicious.  Okay.  What about uh, the supply and MRI obviously it's also for everyone.  Right? |
| ASHOUR: | [U/I] |
| CW | Still, the doctor will decide, you know, whether or not to be suspicious what needs to be done.  Okay, fine. |

        Based on my experience, training and investigation of this matter, I believe ASHOUR and the CW were discussing in this portion of their conversation how to submit false claims to insurance companies without arousing the suspicion of law enforcement officers or insurance investigators.  I also believe that ASHOUR and the CW, in referencing range of motion and "MRI," or magnetic resonance imaging, tests, were discussing common medical tests that could be given to patients as part of the scheme.

---

    [3]    In this Complaint, I use the terms "patient" and "runner" to refer to certain co-conspirators who are not named as defendants in this Complaint.  The "patients" were accident victims who were complicit in the insurance fraud scheme and who were paid to make false injury claims.  The "runners" were individuals who were paid by the partners of Basmala Medical to refer patients to the clinic.

The meeting between the CW and ASHOUR then continued, and they were eventually joined by CC-1.  After CC-1 joined the meeting, the following conversation, in substance and in part, took place:

CW        For three thousand and the other guy have twenty beds for five thousand dollars you're sayin'?

CC-1:     You see what I mean?  Why he wants another thousand, we're gonna, we're gonna pay him thousand dollars plus he wants to [U/I].  What's our point?  I wanna tell him, I think ought to have big place for five thousand dollars.  What is he going to say?  What is he going to do?  Bring in job there, take [U/I] from there.

CW        That's exactly, the bigger, the next question is, where we gonna get the job?

ASHOUR:   [U/I]

CW        That's exactly the point, and what's gonna be the price?  If we're gonna get the job for a good price and he's gonna be responsible, [U/I] for just doing this, then we got kind of, uh, the person who's gonna help us to make sure that we got the, the good cases.

CC-1:     The insurance company [U/I] come and see the, [U/I] going inside which is the five beds.

CW        So what?

ASHOUR:   That's no good.

CW        No good?

ASHOUR:   It's not no good for us.

CC-1:     If you have like fifty percent per day, forty, fifty [U/I] number.  Five beds is not good.  It's not good.

[U/I].

CC-1:     Forty-five minutes each uh, patient.

CW        Ahhhh.  I understand.  So it's gonna be suspicious, in other words, actually and the place is too small, not enough beds, and the patient won't be able to, I got it, I got it, I got it.  I got it, I got it.

ASHOUR:                    [U/I].

CW        Okay.  Then uh . . .

CC-1:     It's not makin' sense to work.  Not makin' sense to work there.

CW        Guess it would be, it's gonna mean no profit, basically.

CC-1:     No, no, no.  He cannot work twenty or thirty patients is not uh, anyway, so suspicious, like [U/I] suspicious.

CC-1:     But to make a profit.

CW        Right.

Based on my experience, training and investigation of this case, I believe ASHOUR, CC-1 and the CW were discussing a new location

for Basmala Medical in this portion of the conversation.  I believe that during this discussion, CC-1 noted that it would be "not good" if they had a space with only "five beds" and received a visit from insurance investigators, as the number of beds would not support the number of claims they intended to submit.

13.    On or about September 4, 2012, the CW met with ASHRAF ASHOUR, the defendant, and CC-1 at a restaurant in Queens, New York. Based on my conversations with the CW and review of a recording of this meeting, I learned that during the meeting the following, in substance and in part, took place:

a.    ASHOUR and CC-1 agreed to "take care of" securing patients for the clinic.

b.    ASHOUR, CC-1 and the CW discussed the operation of the clinic and the calculation of profits and expenses.

c.    ASHOUR, CC-1 and the CW agreed to sell billing services back to doctors, or, in other words, to provide a "kickback" for each time a patient came to the clinic.

14.    On or about September 6, 2012, the CW met with ASHRAF ASHOUR and JIMMY JOSEPH, the defendants, and CC-1 in the parking lot of a Burger King located in Brooklyn, New York.  Based on my conversations with the CW and review of recordings, I have learned that during the meeting the following, in substance and in part, took place:

a.    At the beginning of the meeting, ASHOUR commented that the CW "looks like" an FBI agent and asked to see the CW's sunglasses.  ASHOUR and CC-1 closely inspected the CW's sunglasses and both of them put on the sunglasses.  The CW commented that the CW was clean.  Based on my experience, training and investigation of this matter, I believe ASHOUR and CC-1 inspected the CW's sunglasses to determine whether the sunglasses concealed a listening device because ASHOUR and CC-1 were concerned that the CW was working for the FBI.

b.    The CW told JOSEPH that the CW would be responsible for dealing with the "runners" directly.  JOSEPH stated that he "knew the area well" and could generate "fifteen to twenty" new patients every month.  JOSEPH agreed to work with the CW, ASHOUR and CC-1 and to charge $2,500 per patient.

8

c.    JOSEPH asked "how long does the policy have to been effect?"   CC-1 responded that an "investigation" is "not good," and JOSEPH replied, "Yeah, I know, I know, that is what I am saying. How long?  A month and a half, a month and a half, two months?  What is it?"  CC-1 responded, "What?"  And JOSEPH elaborated, "Let's say somebody had insurance for a month and a half in an accident."  CC-1 then said, "First of all, don't bother yourself [U/I] those are very dangerous."  JOSEPH said, "Yeah," and CC-1 continued, "I'll tell you why I just come out from vacation," and JOSEPH laughed. Based on my experience, training and investigation of this case, I believe JOSEPH was asking ASHOUR, CC-1 and the CW how long the applicable insurance policy would have to have been in existence for Basmala Medical to accept a patient covered by that policy.  CC-1 answered that policies that had only been in effect for a short period of time were "very dangerous" and could lead to "investigations."  I believe that CC-1 further implied that CC-1 had learned this lesson the hard way because CC-1 had just returned from a stint in jail (CC-1 was "on vacation"). I now from my review of law enforcement databases that CC-1 was incarcerated from at least on or about January 3, 2012 until on or about June 29, 2012.

15.    On or about September 14, 2012, the CW met with ASHRAF ASHOUR, the defendant, and CC-1 in Brooklyn, New York.  Based on my conversations with the CW and review of a recording of this meeting, I learned that during the meeting the following, in substance and in part, took place:

a.    ASHOUR indicated that he was frustrated because the clinic's management structure was not yet set.  The CW told ASHOUR that they had just discussed a fifty/fifty split with a medical care provider for the billing, and ASHOUR responded that this did not make sense if the "entire billing" could be sold and more money could be made.

b.    ASHOUR demanded $5,000 to help pay for the clinic's existing expenses.  The CW refused to pay the money because the CW expected to only invest in "new patients."

c.    Based on my experience, training and investigation of this matter, I believe CC-1 and the CW were expecting to collect fifty percent of the bills submitted by the medical care providers going forward, whereas ASHOUR preferred to sell all of the billing for a smaller upfront payment.  Under the scheme envisioned by the CW and CC-1, the clinic had the potential to collect more money over the long term, as it would split any insurance payments the medical care providers received.  Under ASHOUR's scheme, the clinic

9

would collect less money upfront than under CC-1's proposal, but might not maximize its earnings in the future, as the medical care providers would keep all of the insurance payments they received. Based on the information provided by the CW, as well as my review of recordings and records received from insurance companies, I believe Basmala Medical engaged in both schemes during the time that the CW was a partner at the clinic.

16.   On or about September 17, 2012, the CW met at Basmala Medical with ASHRAF ASHOUR, the defendant.  Based on my conversations with the CW and review of recordings, I have learned that the following, in substance and in part, took place during the meeting:

a.   ASHOUR told the CW about four new patients ("Patients-1, -2, -3 and -4") and gave the CW three police reports corresponding to accidents that purportedly gave rise to injuries suffered by the four patients.

b.   ASHOUR told the CW that PHILIP BRUNO, a/k/a "Pull," a/k/a "Bull," a runner who had worked with ASHOUR in the past, had brought in Patient-1.  ASHOUR planned to pay $1,200 to BRUNO for Patient-1.

c.   ASHOUR told the CW that "Jimmy" (JIMMY JOSEPH, the defendant), had brought Patient-2 to the clinic, and that Patient-2 would cost $700.

d.   ASHOUR told the CW that he was not certain whether he would accept the remaining patients, Patients-3 and -4, who had also been referred by JOSEPH.  ASHOUR explained that the police report for the accident in question contained cross-outs that might cause problems in the future.  Based on my conversations with the CW, my review of recordings, and my review of records received from insurance companies, I believe Basmala Medical eventually accepted Patient-3, submitted claims for unnecessary medical treatment for Patient-3, and paid $700 to JOSEPH for referring Patient-3.

e.   ASHOUR provided the CW with a worksheet that contained the names of Patients-1, -2, -3 and -4 and columns with the headings "supply, MRI, Law, R/motion, neuro, VNCT, Pain management, ortho and lifting."  The CW has explained to law enforcement that each column represented a different medical service

10

and that they would use the worksheet to track how much revenue was generated for selling each respective service.

17.    The CW gave law enforcement agents the accident reports and worksheets described above in paragraph 16.e.    Those reports are consistent with the CW's description of the meeting on or about September 17, 2012 with ASHRAF ASHOUR, the defendant, and with ASHOUR's recorded statements during that meeting.

18.    On or about September 27, 2012, the CW met with ASHRAF ASHOUR, the defendant, in a deli located in New York, New York. Members of the FBI conducted surveillance of the meeting.    Prior to the meeting, members of the FBI verified that the CW was not carrying any money.    During the meeting, the CW excused himself and met with another FBI agent in the restroom of the deli.    The agent provided the CW with $5,000 in United States currency to be used to pay office expenses.    After the meeting, the CW informed members of the FBI that the CW had paid the $5,000 to ASHOUR.    Members of the FBI further confirmed that the CW no longer possessed the $5,000 that had been given to the CW.    During the meeting, the following conversation, in substance and in part, took place:

CW          He told me that umm, ah whatchamacallit ah, that she is
            still picky.    That she does not want to do this, she does
            not want to do that; and they're still not sure if she is
            going to go for it or not.    You know what I'm saying?    We
            can do it. [U/I] it's not a problem.    Yeah, but we can go
            with Sergey.    Chinese girl can leave at any moment.
            Ashraf [ASHRAF ASHOUR, the defendant] it's also not [U/I]
            you know what I'm saying?    They gonna turn around and
            leave.    Yana doesn't even know.    She has been working
            there.    We can more or less, you know, you work with her
            actually, which is a good thing.
ASHOUR:     Let me tell you something, [U/I]
CW          It's not going to be a problem.
ASHOUR:     [U/I] everything is ok.
CW          No, no, no, of course, of course, of course, you know her
            . . .
ASHOUR:     [U/I]  There is something I want to tell you . . .
CW          Guys, listen Ashraf [ASHRAF ASHOUR, the defendant],
            whoever it's going to be, it's it's your office, you know,
            it's you're in control of it so there is no question about
            this. Whatever you prefer.

Based on my experience, training and investigation of this matter, I believe that the CW and ASHOUR were discussing a

11

chiropractor who would work at Basmala Medical going forward.   The CW offered a few different options ("Sergey," the "Chinese girl," and "Yana") and said that it was ultimately ASHOUR's decision because it was ASHOUR's "office" and ASHOUR was "in control."   The conversations then continued, as follows:

ASHOUR:    [U/I]

CW:        [U/I] check?

ASHOUR:    [U/I] Three thousand dollars.

CW:        Very good. What about this, uh . . .

ASHOUR     [U/I]

CW:        [U/I] but the other guy, no gave twenty K up front. It's a lot of money.  For the office expenses, you know what I'm saying?

ASHOUR:    Ok, now we're even.

CW:        He gave you twenty K right?  To start the business. It's not going to be that easy.  At least in the beginning.

ASHOUR:    [U/I] I heard about things, but not bad.

CW:        Ashraf [ASHRAF ASHOUR, the defendant], I don't want you to think that I'm not serious. I don't want you to think that I'm not keeping my word. I don't want you to have the impression that it's not going to be a problem what we spoke about, you know what I'm saying?  The doctor, the patient, that you are going to basically help us cover the first couple of months with the office expenses.  But I got this understanding, but I just want to you know, make sure the five thousand that I'm going to give you right now — I'm not getting involved in the office expenses besides the patients.  So, I'm going to continue buying the patients, whatever it is.  I'm going to continue meeting with . . .

ASHOUR:    [U/I] think about yourself, and start.

CW         I understand, Ashraf [ASHRAF ASHOUR, the defendant].  I want to start too.  Listen. Again, listen [U/I], I got with me five thousand.  By the way, here's five thousand.

ASHOUR:    [U/I] very good

CW         I'm meeting with Jimmy [JIMMY JOSEPH, the defendant], I'm giving him three thousand.  Ashraf [ASHRAF ASHOUR, the defendant], I already invested a lot.  And I already paid him money, I mean it wasn't [U/I], ASHRAF.  I just want you to know that I'm not playing around.  I just want you to take care of the office.  I'll continue buying the patients, whatever we spoke about — just make sure it will be profitable for us, Ashraf.  Make sure you're going to get the right doctors, deal with the supplies, with the MRIs to get us the best money possible.  You know, to get

12

back in order to [U/I].  But I'm keeping my word, whatever it is, I know you asked for help, that's why I'm giving you five thousand towards the office. Listen, let's get [CC-1] involved.  He's partners with us.  He got three years.  Listen, I'm paying everything, I'm paying the office expenses.  You got the facility, you got the office, I understand that too.  Let him give us something, actually.  Let him pay some of the expenses, the rent, whatever it is.  Listen, you got the money.  I understand he's a good guy.  He brought in a lot of accounts, the doctors, and so on and so forth.  But listen, we need to start, we got to start doing the billing, we got to start getting the kickbacks from the MRIs.  It's going to be much easier to generate the business.  We're just in the initial stage, it's not easy.  I understand you know what I'm saying.  But other than that I mean, like, listen, I truly believe it's going to be profitable, and I believe in your trust, Ashraf.  That's all.  There's no question. I mean, like listen, business is a business, I understand. So it's not a problem.

ASHOUR:    [U/I]

CW:        No take another one.

Based on my experience, training and investigation of this matter, I believe the CW paid $5,000 to ASHOUR during this portion of the meeting.  The CW told ASHOUR that the money could be used for office expenses, but that future contributions would only be used for new patients.  I further believe that the CW told ASHOUR that they should be using the experience and contacts of CC-1 to expand the scope of the insurance fraud scheme.

19.   The CW informed me that CC-2 became a partner in Basmala Medical in or about October 2012.  At the same time, CC-2 was working as a paralegal in a law firm that represented automobile accident victims.

20.   On or about October 12, 2012, the CW met in Brooklyn, New York, with CC-1 and CC-2 at the law firm where CC-2 was employed as a paralegal.  Based on my conversations with the CW and review of recordings, I have learned that the following, in substance and in part, took place during the meeting:

a.   The CW advised CC-1 and CC-2 that, unless a patient was insured by an "undesirable" insurance company, medical supply companies would pay $200 kickbacks to Basmala Medical when the clinic wrote prescriptions for medical supplies.  The CW further

13

advised that the CW had a list of "undesirable" insurance companies. CC-1 indicated that CC-1 did not think medical supply kickbacks were important, and CC-2 responded that they should be taking kickbacks from everyone possible because they could not keep the fraud going for too long:

> [CC-1], look, we are not going into this fucking business to stay for 15 fucking years but to fucking screw. No need for 15 years. . . . Everything has to be sold. We won't get anything for one year. In one year we will fuck[] everything and split. We are going to open another office and close it too.

Based on my experience, training and investigation of this matter, I believe CC-2 was explaining to CC-1 and the CW that the purpose of the clinic was to engage in fraud over a short period of time and that they should take any source of money — including small ($100) kickbacks from medical supply companies — before they had to shut down the clinic.

b.    CC-2 told the CW and CC-1 that CC-2 wanted to fire "Ashraf's people," meaning employees recruited into Basmala Medical by ASHRAF ASHOUR, the defendant. The CW responded that the CW did not want to fire ASHOUR's people, to which CC-2 responded, "They may be obliging and everything, but we need our own people there who will not rat us out tomorrow. Tomorrow, any investigator may come. And where is the guarantee that they will not rat us out?" Based on my experience, training and investigation of this matter, I believe CC-2's statements demonstrate that CC-2 was concerned that employees recruited by ASHOUR might cooperate with law enforcement ("rat us out") in the event that their insurance fraud scheme was uncovered.

c.    CC-1, CC-2 and the CW had the following conversation about the future of Basmala Medical:

CC-1:    Are there any runners, athletes who'll bring in work?
CC-2:    Yeah, yeah.
CC-1:    That's it then, let them work. Have them bring in thirty jobs.
CC-2:    I'll have a talk with them, they'll work.
CC-1:    [U/I]
CC-2:    Make sure you give me cards.
CC-1:    We'll have to make new cards because, uh, I don't know what name to make them under [U/I].

CC-2:       Change the phone number and everything.
CC-1:       We'll change it, we'll change it.  I'm telling you, I
            didn't do it because . . .
CC-2:       Because it's fucking dirty.  We took too many jobs with
            fraud, fucker, one hundred percent.
CC-1:       He can't take it [UI].
CC-2:       My fucking lawyer is such an imbecile, that [Attorney-1]
            takes too much fucking fraud.
CC:         Yeah?
CC-2:       He has four to five cases that are real fraud. My lawyer
            took them on and I didn't even fucking know about it.
            Fucking stupid.

        Based on my experience, training and investigation of this
matter, I believe CC-2 was agreeing to recruit new patients for
Basmala Medical and that CC-2 told CC-1 that CC-2 needed business
cards to distribute.  CC-1 responded that CC-1 had not yet printed
cards because CC-1 did not know what name the clinic would be using
going forward.  Based on information from the CW, I believe CC-1 was
contemplating changing the name of clinic from Basmala Medical
because Basmala Medical had been implicated in too many fraudulent
billings in the past.  I further believe that CC-2 agreed that
submitting too many fraudulent claims attracted the attention of
insurance investigators and law enforcement, and noted that the
attorney CC-2 worked for was an "imbecile" for "tak[ing] too much
fucking fraud."

            d.    CC-1, CC-2 and the CW had the following
conversation about Basmala Medical's expenses:

CC-2:       How much money do you [U/I]?
CC-1:       A hundred grand.
CC-2:       A hundred grand.
CW:         If there's a need for more, I think I'll find more.
CC-2:       Fifty thousand I can get from the lawyers.
CW:         Yes.
CC-2:       They will give us upfront.  For us giving them work.
CW:         Wonderful.
CC-2:       Fifty thousand will be enough for us to cover all the
            expenses.
CW:         Wonderful!  Agreed.  No problem.
CC-2:       How are we gonna divide the interest?
CW:         [CC-2], I mean [CC-1], if it's going to be twenty people,
            it will be twenty people.  If it's gonna be twenty-five
            to thirty, then it's gonna be thirty [U/I].

15

CC-2:     Also, if I'm going in there, I'll want to put people in bulk through there, I don't want to bother with ten people. Ten, fifteen or twenty people for sale is not profitable.

CW:      No problem, I agree with you.

CC-2:     We're gonna be wasting time otherwise.

CW:      I agree with you.

CC-2:     Everybody will be making money and we will, well, we'll be making like two, three thousand, it's not . . .

CW:      No, that's not interesting at all.

CC-2:     It's a headache.

CW:      I'm not interested in that either.

CC-2:     If we are going in, there should be at least forty people a month.

CW       Listen if we can . . .

CC-1:     It's not a big office.

CW       If we can put through forty people a month . . .

CC-2:     Then there's, I don't know, split four ways there's fucking nothing left, [CC-1], it's not enough for four people. For four people we must put through forty to fifty people a month there.  We will be selling everything afterwards, there's no billing there.

Based on my experience, training and investigation of this matter, I believe CC-1, CC-2 and the CW were discussing the future of the fraud scheme at Basmala Medical.  CC-1 stated that they needed $10,000 to cover expenses.  CC-2 stated that CC-2 could get $50,000 from "lawyers" willing to pay upfront for referrals from the clinic for patients willing to submit false claims to insurance companies. The group then discussed how even with that money, the clinic would not generate enough proceeds to justify the scheme without processing roughly forty fake patients a month.  CC-2 further observed that they were "selling" all of their patients — in exchange for upfront payments, referring the patients to complicit medical care providers, who then submitted bills to insurance companies and kept everything they collected — rather than submitting the bills themselves, which generated greater proceeds.

21.  On or about October 15, 2012, the CW met in Brooklyn, New York, with ASHRAF ASHOUR, the defendant, CC-1 and CC-2.  This meeting was recorded.  During the meeting, ASHOUR, CC-1, CC-2 and the CW agreed to become partners in the operation of Basmala Medical. They agreed to the following split of any profits:  35% for the CW, 25% for CC-1, 25% for CC-2, and 15% for ASHOUR.  The CW agreed to provide money to purchase patients, CC-1 agreed to run the clinic, CC-2 agreed to recruit new patients, and ASHOUR agreed to provide

16

the clinic's existing physical space and equipment and to work as a physical therapist at the clinic.

22. On or about November 9, 2012, the CW met in a car in Brooklyn, New York with CC-2 and a runner whom CC-2 had introduced to the CW ("Runner-2"). Prior to the meeting, members of the FBI confirmed that the CW was not carrying any money, and then gave the CW $4,500 in United States currency to be used to pay Runner-2. After the meeting, members of the FBI met with the CW, confirmed that the CW no longer had the $4,500, and learned that the CW had given the $4,500 to Runner-2 as a payment for referring three patients to Bismala Medical. Based on my conversations with the CW and review of recordings, I have learned that the following, in substance and in part, took place during the meeting:

CW:        Ah, I remember you.
Runner-2:  What's up?  Yeah, I remember him too.
CW:        What's going on?
Runner-2:  Not much.  Same old.
CW:        Everything is good?
Runner-2:  Yeah.
CW:        Okay.
CC-2:      [U/I] What's the number he's supposed to get? Tell him,
           he wants to know.  We trust each other.
CW:        Forty-five, right?  For three, for three people.
(Sound of counting money and conversation in Russian)
Runner-2:  That's, that's because, what was that?  That was a Geico,
           right?
CC-2: [U/I] yeah.
Runner-2:  So what's regularly? My cases is good.
CW:        Well it depends actually.  Case-by-case, as I said that,
           actually.  If you have the police report, best thing to
           fax it over, give it to me, give it to [CC-1], we'll look
           at it and we'll discuss it up front so it won't be any
           surprises for you; it won't be any surprises for, for us.
           Now, question for you, they coming in right?
Runner-2:  Yeah.
CW:        You coach them?
Runner-2:  Yeah, they good.
CW:        They good, okay.  As long as they know what to say, what
           to do so it's not going to be a problem right?
Runner-2:  Yeah, they good.
CW:        Complaints and everything else. Okay, okay.  Did they do
           any MRI's so far?
Runner-2:  I have no idea. They should have.
CW:        [CC-2], did they do anything?

17

```
CC 2:       They had an appointment for the second.
CW          For the MRI?
CC 2:       Yes.
CW          What about the attorney?
CC 2:       Attorney is my attorney.
CW          Okay.  Did they sign for it?  Did they sign for it?  I
            don't know, I don't know, I just came back, that's why I
            don't know.
Runner-2:   They fine.
CW          Okay.
Runner-2:   We're good.
CW          Uhm, so they didn't do anything except for the MRI, are
            they scheduled for MRI only? So they didn't . . .
CC 2:       They were scheduled but the second was the storm.  I don't
            know if they went or they didn't go.
CW          So they didn't do anything so far, any procedures?
CC 2:       I don't know. This is [CC-1] and your job to [U/I]. I mean
            [CC-1's].
CW          Okay.
CC 2:       I'm not there. You gotta check. But they're good. They're
            good people. Don't worry about it.
CW          How many you got? [U/I]
Runner-2:   Three.
CW          How many people can you send us?
Runner-2:   Oh that depends, I gotta know, I gotta see what's going
            on. I'll text you. I'll see what's up with the next report.
CW          Ok. Was Good to see you
```

Based on my experience, training and investigation of this matter, I believe the CW and CC-2 were meeting with Runner-2 to pay $4,500 to Runner-2 for referring three patients to Basmala Medical. Runner-2 asked what he/she could expect to get paid going forward, and the CW responded that it would depend on the case and the quality of the police report, which Runner-2 could fax to the clinic before bringing in the patients so that there would be no "surprises."  The CW and CC-2 then discussed the treatments being given to the three patients referred by Runner-2, and CC-2 responded that CC-2 did not know what treatments had been given and that it was the responsibility of CC-1 to coordinate the treatments.  I also believe the reference to "Geico" to be a reference to the insurance company by that name.

23.    On or about November 16, 2002, the CW met with CC-1 at Basmala Medical.  Based on my conversations with the CW and review of recordings, I have learned that the following, in substance and in part, took place during the meeting:

18

      a.    CC-1 told the CW that "yesterday" CC-1 paid "twelve," or $1,200, to JIMMY JOSEPH, the defendant.

      b.    CC-1 used code words, such as "milk," "bread rolls," and "kopecks," to describe payments CC-1 had made to different runners.

      c.    CC-1 stated that they received "$2,400" from a "law firm" for "two people" and "a lot" for "MRIs."

      d.    The CW and CC-1 discussed how the clinic had thirty-two patients.

Based on my experience, training and investigation of this matter, I believe CC-1 and the CW were discussing expenses, including payments made to runners for expenses, and revenues, including kickbacks from MRI clinics and law firms for patient referrals. Following this conversation, CC-1 and the CW met with JOSEPH. CC-1 told the CW to pay JOSEPH "$800 for three people," the CW reminded CC-1 that CC-1 had "the money," and CC-1 then paid $800 to JOSEPH.

24.    On November 18, 2012, the CW met with ASHRAF ASHOUR, the defendant, CC-1 and CC-2 at a Dunkin Donuts coffee shop in Brooklyn, New York. Based on my conversations with the CW and review of recordings, I have learned that the following, in substance and in part, took place during the meeting:

      a.    The CW, ASHOUR, CC-1 and CC-2 discussed that they need a better system of tracking revenues, as CC-2 had generated bills to insurance companies that yielded $8,500, CC-2 has invested $11,000, the CW had invested $5,000, and no one could account for where all of the money had been spent.

      b.    CC-2 stated that CC-2 did not want the CW talking to runners whom CC-2 brought to Basmala Medical.

      c.    CC-2 stated that the CW should be the "collector," not CC-1.

Based on my experience, training and investigation of this matter, I believe this meeting concerned the partners' concern that they were not collecting enough via kickbacks and false billings given the number of patients they had purchased.

19

25.    Based on my conversations with the CW and review of recordings, I learned that the following took place on or about December 2, 2012, at Basmala Medical:

a.    The CW met with ASHRAF ASHOUR, the defendant, CC-1 and CC-2.  During the meeting, CC-1 reported paying $800 to PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," the defendant, and that Runner-2 wanted $2,500 for "a good case."  Based on my experience, training and investigation of this matter, I believe CC-1 was reporting on payments made to runners for patients willing make false insurance claims.

b.    Later that day, the CW met with ASHOUR and CC-1 and complained that he/she had "already spent $20,000" on payments for patients but that he/she was not making any profit.  ASHOUR became upset and left the clinic.  The CW and CC-1 then discussed how ASHOUR was failing to satisfy his agreement to take care of physical therapy treatments at Basmala Medical.

c.    Later that day, the CW met with CC-1 and CC-2.  During that meeting, the group discussed Basmala Medical's finances, including a $1,000 payment that CC-1 made to JIMMY JOSEPH, the defendant.

26.    On or about December 11, 2012, the CW met on the street outside Basmala Medical with CC-1 and Patient-3.  Based on my conversations with the CW and review of recordings, I have learned that the following, in substance and in part, took place during the meeting:

CC-1:    [U/I] and don't say you're not sick.
CW      God forbid you get sick . . .
CC-1:    Yes, because we need to give the tests for the, your attorney sent me a letter.
CW      Uh huh.
CC-1:    So I have to get some medical records, and what are we gonna send them?  I don't send only MRI, and I haven't send neurology test either.  So when you're gonna come, don't say you're not sick.  [U/I]  No, no, tomorrow you do neurology.  Come tomorrow you gonna take the test.  Alright, please . . .
PATIENT-3: I'm good.  I'll tell him I'm sick.
CC-1:    Your attorney's gonna make a case.  You say you're not sick?  I mean [U/I], how you gonna win the case if you're okay?
PATIENT-3: No, you're right.

20

Based on my experience, training and investigation of this matter, I believe CC-1 was telling Patient-3 to lie to Patient-3's doctor about being injured.  CC-1 explained that Patient-3 could not say that he/she was not sick when the doctor was going to conduct a "neurology test," or else they would not be able to collect money for Patient-3's treatments and Patient-3's attorney would lose the lawsuit arising out of Patient-3's automobile accident.  Patient-3 responded that he/she understood and that he/she would "tell him I'm sick."

27.  On or about December 20, 2012, the CW met with CC-1 at Basmala Medical.  During the meeting, the CW and CC-1 discussed JAMES KAUFMAN, the defendant, and payments KAUFMAN was making for referrals for patients who needed medical supplies.  During the meeting, the following conversation, in substance and in part, took place:

CW          He would pay us 200 dollars for the MS [Medical Supplies].
            He will be paying us by some check from another company.
            He says, "I am not in this business.  If they will ask about
            something, we would say that [KAUFMAN] did introduce you,
            and this is a right thing to do because we don't want any
            suspicious and everything must be done beautifully," and
            that's his proposal.  I think these are custom made items.
CC-1:       Yes, but 100 dollars is not enough.
CW          I suspect that he doesn't really care what to write.
CC-1:       Be careful with him.  Let me tell you, you know, I wouldn't
            discuss this matter with him.  There was a chiropractor
            in Bronx where this fucking shit happened in 2003.  I
            didn't know him personally.  He's done the same fucking
            shit and then rat on everybody and as a result of that,
            the son and the father did spend a year in jail.
CW          Why? I thought he's our man whom we could talk to.
CC-1:       You are wrong.  There are no such people there as "our man."
            This business is very dangerous.  I am fucking afraid of
            showing up there.  I am simply afraid.  But besides
            everything it's a fucking great business.  If we can get
            twenty to twenty-two people a month, this is thirty
            thousand cash.

Based on my experience, training and investigation of this matter, I believe KAUFMAN was offering to introduce CC-1 and the CW to a medical supplies vendor who would pay $200 kickbacks for medical supplies prescribed by Basmala Medical.  CC-1 agreed, but cautioned that if they had to split the payment with KAUFMAN, $100 would not

21

be enough to justify the purchases from the vendor.  CC-1 further cautioned the CW to be careful around KAUFMAN, as CC-1 knew a chiropractor in the Bronx who was making similar payments for medical supplies who assisted law enforcement in prosecuting the people who made the referrals ("rat on everybody and as a result of that, the son and the father did spend a year in jail").  I believe that CC-1 continued to warn the CW that the CW could not trust anyone ("There are no such people there as 'our man.'") because the no-fault fraud scheme was a "dangerous" business.  I believe this statement demonstrates CC-1's understanding that the no-fault business is illegal and that it is risky as a result.

28.  On or about December 27, 2012, the CW met with CC-1 and CC-2 at Basmala Medical.  During the meeting, the CW, CC-1 and CC-2 discussed how to buy ASHRAF ASHOUR, the defendant, out of the clinic and who would replace ASHOUR as the clinic's physical therapist.  The CW offered to place an ad on Craig's List for a chiropractor, and CC-1 responded, "You can't to do that, the FBI will respond to that ad."  CC-1 then stated that CC-1 had been "covering their asses" and that they should "close it down and get the fuck out."  Based on my experience, training and investigation of this matter, I believe these statements demonstrate that CC-1 and CC-2 knew they were engaged in fraud and were concerned about law enforcement monitoring of their activities.

29.  In or about January 2013, the CW, based on instructions from the FBI, left Basmala Medical.  From in or about January 2013 until in or about June 2013, the CW had sporadic conversations with CC-1 in which CC-1 indicated that Basmala Medical continued to operate and asked the CW to return to the clinic.  At the direction of law enforcement, the CW declined to return to the clinic.

**JAMES KAUFMAN**

30.  On or about December 11, 2012, the CW advised members of the FBI that JAMES KAUFMAN, the defendant, was a chiropractor who was going to be working at Basmala Medical.

31.  As described above at paragraph 27, on or about December 20, 2012, the CW met with CC-1 and discussed kickbacks for medical supply prescriptions that would be paid by a vendor referred by JAMES KAUFMAN, the defendant.  Later that same day, the CW met with KAUFMAN at Basmala Medical.  During that meeting, the following conversation, in substance and in part, took place:

22

CW:        I spoke with [CC-1] about you.

KAUFMAN:   Uh hmmm.

CW:        Ah, [another co-conspirator not named as a defendant herein ("CC-3")] [U/I] . . .

KAUFMAN:   Okay, no problem.

CW:        You will know who she [CC-3] is and she will tell you what she is expecting basically.

KAUFMAN:   No problem, I'm used to this.

CW:        If that can be done, that will be greatly appreciated

KAUFMAN:   Yes, I can do that.

CW:        That's gonna be greatly appreciated.

KAUFMAN:   Not a problem by me, I just need a piece of letterhead so I can start writing.

CW:        Absolutely, absolutely.  She seems to be very knowledgeable, been doing this for a long time.

KAUFMAN:   Let's put it this way — Park Avenue Trauma, I opened it in 1985, in the city.  And before everybody moved into the business, I'm one of the guys who was doing everything. I've had offices in Brooklyn and the Bronx, several times, Staten Island, Brooklyn, a couple times, I'm used to it.

CW         That's great.

KAUFMAN:   And when I was first in practice, I did it, all the DME [Durable Medical Equipment] in my office.  So it's never that I've not written it before.

CW         What about IMEs [Independent Medical Examinations]?

KAUFMAN:   I've done IMEs.  I've worked for both sides.

CW         What about [U/I]?

KAUFMAN:   So, what I'm doing is I'm qualifing the patients and then he'll do them.

CW         I got you.  That's what I want to ask you about.

KAUFMAN:   No problem, I only found two, but I don't get all the MRI reports.  I need to see the MRI reports so I can start qualifying them.

CW         Obviously, obviously, no question.

KAUFMAN:   And I took training from somebody Guy didn't, so I have a different perspective.  But because I've done it and I can qualify them, I'm not the one doing them.  But I will figure out who they are and that's not hard.

CW         That's great.


Based on my experience, training and investigation of this matter, I believe CC-3 works for a medical supply company.  In this portion of the conversation, I believe the CW and KAUFMAN were discussing fraudulent prescriptions that KAUFMAN would issue for medical supplies to be purchased from CC-3's company.  KAUFMAN agreed to coordinate with CC-3, who would explain what CC-3 needed

23

the prescriptions, and KAUFMAN would start "qualifying" Basmala Medical's patients for the equipment and writing the prescriptions as soon as he obtained Basmala Medical's "letterhead." KAUFMAN further explained that he had been justifying prescriptions for "DME," or Durable Medical Equipment, for a long time, and that he knew what to say because he had worked on "both sides." In other words, KAUFMAN had been hired in the past by insurance companies to conduct "IMEs," or Independent Medical Examinations, of patients being treated by other medical care providers. I believe that these IMEs would be used to determine the extent of injuries suffered by those patients.

At this point in the meeting, CC-1 entered the room, and the following conversation, in substance and in part, took place:

CC-1:      What's up guys?
CW:        [CC-3] is coming in today, so he [KAUFMAN] said that
           actually, he should not have a problem hooking in to start
           doing whatever.
KAUFMAN:   Just get me some letterhead, and I'm gonna be a writing
           fool.
CW:        (laughter)
KAUFMAN:   I'm very easy.
CW:        That's good.
CC-1:      (Speaking in Russian)
CW:        Bad back, actually, the custom fitted items, and the amount
           we discussed with you, can it be like one hundred fifty?
KAUFMAN:   That's what they're doing. That's what they're doing.
CW:        'Cause one hundred is kind of on the lower side.
KAUFMAN:   Okay, but it's uh, different companies, so if you start
           getting snooped into, it's just a different thing. I find
           that if you can throw in another company, anytime along
           the way, even if it's just once or twice a month, it's just
           good.
CW:        Just somebody else right?
KAUFMAN:   Yeah, because then it's not that you're using only one
           company.
CW:        It's not gonna be that suspicious. I got you.
KAUFMAN:   That's right. It just lowers your profile a little. And
           I don't know if she's offering two hundred dollars on the
           EMS [Electronic Muscle Stimulator] unit.
CW:        Well, custom fitted, it's . . .
KAUFMAN:   Well EMS is different.
CC-1:      I saw two hundred dollars EMS [U/I].
KAUFMAN:   So if you're doing the same two, everything on the menu,
           try and do it outside. 'Cause you're gonna get the same
           number wherever you go.

24

| | |
|---|---|
| CW: | No, no, no.  We're trying to spread out, actually, so we're not gonna be like, as you mentioned, it's a good thing. We're gonna do that. |
| KAUFMAN: | Just do a couple there on that.  And Geico is used to my writing on that company.  Geico is used to me on that. |
| CW: | That's good. |
| KAUFMAN: | I've only done a couple of them because I'm trying to keep my profile down on that. |
| CW: | I already spoke to [CC-3] and [CC-3] should be coming at around 4:30-5:00. |
| KAUFMAN: | 'Course I showed you what my standard order is.  So not a problem. |
| CW: | And she's gonna tell you more specifically actually what she wants. |

During this portion of the conversation, I believe the CW and KAUFMAN were explaining to CC-1 that KAUFMAN was prepared to start writing fraudulent prescriptions immediately for medical equipment to be purchased from CC-3's company.  I further believe they discussed that KAUFMAN would refer CC-1 and the CW to another company that would pay $150 kickbacks for prescriptions for "custom fitted items," including knee and back braces.  KAUFMAN advised that it was preferable to use "different" medical supply companies for different items, as it would be suspicious for the clinic to get all of its supplies from the same company ("I find that if you can throw in another company, anytime along the way, even if it's just once or twice a month, it's just good.").  Lastly, KAUFMAN observed that they should not send prescriptions for EMS units, or Electronic Muscle Stimulator units, to CC-3's company, as every medical supply company would pay $200 kickbacks for the prescription.  KAUFMAN further explained that Geico, an insurance provider, was used to KAUFMAN writing prescriptions for EMS units from a company different than CC-3's company.

32.    On or about January 2, 2013, the CW met JAMES KAUFMAN, the defendant, at Basmala Medical.  During the meeting, the following conversation, in substance and in part, took place:

| | |
|---|---|
| CW: | What's the resolution with the prescriptions? |
| KAUFMAN: | I've been getting them altogether.  I've been going through all the files and catching them up.  I mean, there's seven more on the desk that I have to find. They're buried.  And I got ten or twelve more piles to go through.  I'm trying to get everything caught up before I go. |
| CW: | Let me get your number real quick in case. |

KAUFMAN:     XXX-XXX-3214.  The bottom number is for my home address, but I run my administrative office out of there.  I would not put my Brooklyn office on there.  I don't want to create any problems…

CW:          Basically, did you clear up the issues [U/I]?

KAUFMAN:     I can't write her more than I can write her at a time.  But I will try to write everything.  What I'm trying to do is go through all the files and get everything written.  But sometimes I can't write more than I'm writing at the moment I'm writing it.  But the next time they come in, or I get the MRIs back, I can write more things.  I can't write MRIs through, I can't write the AP for the LSOs and CSOs until I see the MRIs.

CW:          Uh hmm, so you don't have some MRIs still in the files?

KAUFMAN:     As far as I know, I've got no MRIs, unless they're in front, cause there's no MRIs in here, unless I grabbed them from [U/I], these are the new patients from the other day.  I had to go out and buy file folders.

CW:          Because I know [U/I].

KAUFMAN:     Well, I know some of the patients went this week for MRIs. But by the time we get done, by the end of this week, I will have gone through every file for every patient I have and see if there are MRIs.  And if I have MRIs I'll write the [U/I].

CW           The first, the second MRI has to be there right?

KAUFMAN:     Because I can start with, some of them have a lot, I've written, some carpal tunnel braces, some elbow braces.  I will find everything that the patient has.  If they have it, I'll find it.

CW           I got you.  Sounds good enough.

KAUFMAN:     It's just on the knee stuff, if you had the orthopedic surgeon and he doesn't write something, I'll go ahead and write it anyways.  I got this because it's so much easier to deal with.

CW           Not a problem doctor, not a problem.

KAUFMAN:     We're gonna have it nice and easy.

Based on my experience, training and investigation of this matter, I believe the CW and KAUFMAN were discussing fraudulent prescriptions for medical equipment that KAUFMAN was writing for Bamala's patients.  KAUFMAN explained that he was reviewing patient files and writing prescriptions based on any evidence of an injury that he could uncover in the files, regardless of whether the doctors who had treated the patients had deemed the equipment to be necessary ("if you had the orthopedic surgeon and he doesn't write something, I'll go ahead and write it anyways").

33.    Based on my review of records obtained from insurance companies and records provided by the CW from Basmala Medical, I learned that JAMES KAUFMAN, the defendant, wrote at least 44 fraudulent prescriptions for medical supplies for Basmala Medical's patients.

## JIMMY JOSEPH

34.    As described above in paragraph 14, on or about September 6, 2012, JIMMY JOSEPH, the defendant, met with ASHRAF ASHOUR, the defendant, CC-1 and the CW.  During the meeting, the following, in substance and in part, took place:

a.    JOSEPH agreed to supply patients to Basmala Medical in exchange for monetary compensation and discussed details of the scheme, such as amounts he would be paid and the length of time an insurance policy needed to be in effect for Basmala to accept a patient covered by that policy.

b.    The CW asked JOSEPH, "So you're our main guy?" JOSEPH answered "yes" and stated that he had been "doing this" for "five or six years."

c.    JOSEPH stated that his phone number was XXX-XXX-0825 (the "0825 Cellphone").

35.    As described above in paragraph 16, on or about September 17, 2012, the CW made a recording of a conversation with ASHRAF ASHOUR, the defendant, in which ASHOUR stated that "Jimmy" (meaning JIMMY JOSEPH, the defendant) had brought Patient-2 to Basmala Medical in exchange for a $700 payment.

36.    On or about September 17, 2012, the CW exchanged text messages with the 0825 Cellphone, which is used by JIMMY JOSEPH, the defendant.  The text messages stated, in substance and in part:

JOSEPH:    What's up [CW] this is jimmy can you have [CC-1] call me or u. I have these 2 people
CW    Sound good, Let me get in touch with u later Fax reports to the office and put attention [CW]
JOSEPH:    Well let me know. Cuz its just happen over the weekend they bugging me to put them somewhere.  I don't have the paper yet.
CW    I want them but I need to see the paper before discussing details

27

JOSEPH:     Ok. We'll take them don't let them see the doc until you see the paper, and if you want them after the paper they stay if not I can always move them.  It's up to u.

CW:         Send them in, I'll tell Ashraf [ASHRAF ASHOUR, the defendant], make sure they make the right complaints

JOSEPH:     You talking to a pro [CW] lol.  I got you.  Cool.

CW:         Send them in ASAP, just spoke to Ashraf [ASHOUR] he is waiting for them

JOSEPH:     Cool

Based on my experience, training and investigation of this matter, I believe these text messages concerned two patients referred by JOSEPH.  JOSEPH wanted to bring the patients to Basmala Medical, but he did not yet have the police accident report (the "paper").  The CW agreed to take the patients, provided that JOSEPH produced the accident report.  The CW further advised JOSEPH to make sure the patients made "the right complaints;" that is, that they complained of the right type of injuries to generate fraudulent medical treatments.  JOSEPH responded that the CW was talking like "a pro" and that he would take care of it ("I got you").

37.   On or about September 25, 2012, the CW met with JIMMY JOSEPH, the defendant, and CC-1 at Basmala Medical.  During the meeting, the following conversation, in substance and in part, took place:

JOSEPH:     If you have uh, a pre, uh, I understand how the situation goes.  It's like I had somebody in Jersey, in Jersey, the person came, had an accident [U/I] and find out, the policy had 150 grand on it.  150,000. If I have a policy holder with $150,000, I'll bring that person to a medical [U/I], I'm not giving it to you for three

CC-1:       I understand.

JOSEPH:     You understand what I'm saying?  I'm not, I guarantee I'm not, I'mma go bargaining, bargaining basically.  I'm getting the highest paid out of it 'cause I know you gotta basically do what you got to do.  I have been, like I said . . .

CC-1:       [U/I]

JOSEPH:     Like I said, have been here for a long time.  I'm not a kid in this.  I grew up in this business.

Based on my experience, training and investigation of this matter, I believe JOSEPH was telling ASHOUR and the CW that he would ship his patients around to other fraud mills to secure the best payment, regardless of his agreement with Basmala Medical.  I also

believe that JOSEPH was stating that he was going to get the best price for this valuable patient. New Jersey policies had $150,000 limits, thus increasing the potential to bill higher than $50,000. I further believe that JOSEPH referenced his considerable experience with no-fault insurance schemes preceding his agreement with Basmala Medical ("I grew up in this business").

38. On or about September 25, 2012, the CW met with JIMMY JOSEPH, the defendant, in Staten Island, New York. During the meeting, the following conversation, in substance and in part, took place:

CW:      Actually, one more thing, you tell the people what needs to be said, to make sure that everything is fine.
JOSEPH:  Everything is, listen [U/I] everything . . .
CW:      My issue is . . .
JOSEPH:  Nobody will come . . .
CW:      . . . complain, complain, and everything . . .
JOSEPH:  . . . nobody gonna say [U/I]
CW:      . . . supposed . . .
JOSEPH:  [U/I]
CW:      . . . whatever they supposed to say.
JOSEPH:  They supposed to say, exactly. I actually make up, I actually put the icing on the cake all of the time. There's always icing on the cake.
CW       Okay.
JOSEPH:  Always, and people know that, I mean . . .
CW       Okay.
JOSEPH:  They gotta understand, this is a business.
CW       But listen, don't make it too much, basically [U/I] . . .
JOSEPH:  No, no, come on, come on [U/I].

Based on my experience, training and investigation of this matter, I believe JOSEPH and the CW were discussing how JOSEPH would coach patients JOSEPH referred to Basmala Medical to make the correct complaints to maximize fraudulent billings to be submitted to insurance companies.

39. As described above, the CW and/or CC-1 met JIMMY JOSEPH, the defendant, on numerous occasions to pay JOSEPH for referring patients to Basmala Medical.

40. Based on my conversations with the CW, review of recordings made by the CW, and review of records from Basmala Medical produced by the CW, I believe JIMMY JOSEPH, the defendant, was paid

for referring at least ten patients to the clinic for fraudulent medical treatment.

**BRISLEY DESIRE**

41.    On or about November 26, 2012, the CW met with BRISLEY DESIRE, a/k/a "Bruce," the defendant in Queens, New York.  During the meeting, the following conversation, in substance and in part, took place:

CW          What I'm offering, what I'm trying to tell you, give me
            the police reports up front, let me see, we shake hands,
            and if your people are coming in, doing whatever needs to
            be done, complaining about uh, doing what needs to be done,
            they coming in, I got no problem giving you what I owe you.
DESIRE:     Well let me tell you something else, for example these
            people that I only got the one for, right, you can speak
            to my reputation, I didn't even give these people all the
            money.  'Cause you gave me one, right?  You gave me one,
            I gave each of them half of what I'm supposed to give them,
            and I told them just keep on coming, and then I'm gonna
            give you the other half.  'Cause I was supposed to give each
            of them five hundred dollars a piece right?  So I gave them
            two hundred fifty dollars a piece, and I said just keep
            on going, and I said [CC-1] said, "Oh, don't worry about
            it because of the second MRI," whatever whatever.
CW          No, no, I understand you feel yourself, like you betrayed.
DESIRE:     No, forget about betrayed.  I'm telling you that right
            now, I should earn your trust because these people, they
            didn't get everything yet, and they still come to your
            place.

Based on my experience, training and investigation of this matter, I believe the CW and DESIRE were discussing how DESIRE would be paid for referring new patients to Basmala Medical.  The CW explained that DESIRE would be paid at a later point, assuming the documentation of the accident (the "police reports") was sufficient and the patients appeared as required for treatments that they did not in fact need ("your people are coming in, doing whatever needs to be done").  DESIRE responded that with respect to patients he had previously brought to Basmala Medical, he had agreed to pay the patients $500 for making false claims, that he had only paid them $250 each because Basmala had only paid DESIRE $1,000, and that the patients had continued to appear at Basmala as required for fake treatments even though they not been paid in full.  DESIRE explained

30

that this demonstrated his "reputation" and should be sufficient to earn the CW's "trust" with respect to future patients.

42.    Based on my conversations with the CW, review of recordings made by the CW, and review of records from Basmala Medical produced by the CW, I believe BRISLEY DESIRE, a/k/a "Bruce," the defendant, referred at least two patients to the clinic for fraudulent medical treatment.

## PHILIP BRUNO

43.    On or about September 20, 2012, the CW met with CC-1. According to the CW, CC-1 told the CW to meet with a runner named "Paul," who was subsequently identified as PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," the defendant, and to pay BRUNO $400 for referring a patient.    CC-1 told the CW that the police report was "good" and that BRUNO should be paid.    CC-1 told the CW to meet with BRUNO at a Toys-R-Us located in Brooklyn, New York.

44.    Later that day, members of the FBI observed the CW meet with PHILIP BRUNO, a/k/a Paul, a/k/a "Bull," in the parking lot of a Toys-R-Us in Brooklyn, New York.    During that meeting, the following conversation, in substance and in part, took place:

| | |
|---|---|
| CW | Ah, you coaching people?   They know what needs to be done? |
| BRUNO: | [U/I] everything, know everything. |
| CW | It's not going to be a problem? |
| BRUNO: | It's not a problem. |
| CW | Make sure they complain and everything. |
| BRUNO: | Of course, of course. |
| CW | Because otherwise it doesn't make sense.   You know what I'm saying? |
| BRUNO: | I know, I know, of course, of course. |

Based on my experience, training and investigation of this matter, I believe the CW was asking BRUNO whether BRUNO had "coach[ed]" the patients BRUNO referred to Basmala Medical about how to lie about the scope of their injuries in order to maximize unnecessary treatments and tests that could be conducted on those patients.

45.    On or about September 25, 2012, the CW met at Basmala Medical with CC-1 and PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," the defendant.    BRUNO had brought a police report for CC-1 and the CW to review.    After examining the police report, CC-1 stated that they would not take patients from the accident because the accident

31

involved a rental truck, that there would be an "investigation" as a result, and they might not get paid.

46.    On or about January 2, 2013, the CW met with CC-1 and PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," the defendant, on the street near Basmala Medical.  During the meeting, the CW paid BRUNO $500, furnished by law enforcement, for referring two patients to Basmala.

47.    Based on my conversations with the CW, review of recordings made by the CW, and review of records from Basmala Medical produced by the CW, I believe PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," the defendant, was paid for referring at least four patients to the clinic for fraudulent medical treatment.

## MARK NELSON

48.    On or about December 5, 2012, the CW met with MARK NELSON, the defendant, in Flatbush, New York.  According to the CW, NELSON was a runner who had previously worked with CC-1.  CC-1 told the CW, in sum and substance, that NELSON knew what he was doing. During the meeting, the following conversation, in substance and in part, took place:

NELSON:    Got to be careful these days.  I just do by recommendations now.
CW         Makes sense.  How long you been doing this?
NELSON:    About four years.
CW         Good enough, so we don't need to talk about the things that the patient needs to complain and it's not gonna be a problem with the doctor.
NELSON:    Nah, nah.
CW         The last thing I want to hear when the doctor is escorting someone from the office saying that the people are absolutely fine.  You know how it works.
NELSON:    Yeah.
CW         You need to get paid and we need to get paid.  In order for us to make sure we get paid, just tell them to make sure they, you know.
NELSON:    Do what they need.
CW         Do what they need to do and you know they not gonna have any problems.  And make sure they not complaining too much, you know what I'm saying?
NELSON:    Uh huh.
CW         So it's not gonna be like too obvious and at the same time we won't have a problem.  Basically that's it.

32

Based on my experience, training and investigation of this matter, I believe the CW and NELSON were discussing how NELSON would coach patients NELSON referred to Basmala Medical to make sufficient complaints to justify fraudulent billings.  I further believe that NELSON indicated that he recognized the risk of engaging in insurance fraud and therefore relied on others he trusted to vouch for the clinics that he worked with ("I just do by recommendations now").

49.    Based on my conversations with the CW, review of recordings made by the CW, and review of records from Basmala Medical produced by the CW, I believe MARK NELSON, the defendant, was paid for referring at least one patient to the clinic for fraudulent medical treatment.

## IDENTIFICATIONS

50.    Members of the FBI have conducted surveillance of certain of the CW's meetings with individuals the CW identified as ASHRAF ASHOUR, JAMES KAUFMAN, JIMMY JOSEPH, BRISLEY DESIRE, a/k/a "Bruce," PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," and MARK NELSON, the defendants.  Members of the FBI have also reviewed photographs of ASHOUR, KAUFMAN, JOSEPH, DESIRE, and BRUNO, contained in public and law enforcement databases.  The individuals the CW identified as ASHOUR, KAUFMAN, JOSEPH, DESIRE, and BRUNO, appear to me to match the photographs of ASHOUR, KAUFMAN, JOSEPH, DESIRE, and BRUNO, contained in public and law enforcement databases.

33

WHEREFORE, the deponent prays that warrants be issued for the arrest of ASHRAF ASHOUR, JAMES KAUFMAN, JIMMY JOSEPH, BRISLEY DESIRE, a/k/a "Bruce," PHILIP BRUNO, a/k/a "Paul," a/k/a "Bull," and MARK NELSON, the defendants, and that ASHOUR, KAUFMAN, JOSEPH, DESIRE, BRUNO, and NELSON be imprisoned, or bailed, as the case may be.

_____
MARTHA M. BERDOTE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
5th day of January, 2015.

_____
THE HONORABLE JAMES L. COTT
United States Magistrate Judge